## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | **CRIMINAL NO.:** _____ |
| **v.** | : | |
| | : | **Violations:** |
| | : | |
| **ROBERT L. MCKINNEY,** | : | **18 U.S.C. § 201 (Bribery of a** |
| | : | **Public Official)** |
| **Defendant.** | : | |
| | : | **18 U. S. C. § 2 (Aiding and Abetting** |
| | : | **and Causing an Act to be Done)** |
| | : | |
| | : | **28 U.S.C. § 2461 & 18 U.S.C. §** |
| | : | **981(a)(1)(C)(Criminal Forfeiture)** |

### I N F O R M A T I O N

The United States Attorney charges:

### Relevant Individuals and Entities

1.      From in or about 2002 through the present, the defendant, ROBERT L. MCKINNEY, was the founder and President of Alpha Technology Group, Inc. ("ATG").

2.      ATG was an international project management and services company that offered its capabilities to federal, state, and municipal agencies as well as commercial companies.  ATG maintained its corporate headquarters in Waldorf, Maryland.

3.      The United States Army Corps of Engineers ("USACE") was a branch of the United States Army.  The Headquarters for the USACE was located at 441 G Street, N.W., in the District of Columbia.  The Directorate of Contingency Operations ("DCO") was a branch of the USACE. The USACE administered the Technology for Infrastructure, Geospatial, and Environmental Requirements ("TIGER") Contract.

4.      The TIGER Contract was a vehicle that authorized federal government agencies and departments used to purchase products and services.  The TIGER Contract was an audited and awarded Indefinite Delivery/Indefinite Quantity ("IDIQ") contract.  As a result, such authorized agencies and departments were not required to obtain three separate bids or to compare the TIGER Contract to another contract before submitting an invoice for products and services through the TIGER Contract.

5.      Until October 4, 2011, KERRY F. KHAN ("KHAN") was a Program Manager with the USACE's DCO at Headquarters in Washington, D.C.  KHAN was involved in, among other things, placing orders for the DCO through federal government contracts, including the TIGER Contract.

6.      Until October 4, 2011, MICHAEL A. ALEXANDER was a Program Director with the USACE's DCO at Headquarters in Washington, D.C.  ALEXANDER was responsible for, among other things, obtaining funding for USACE orders placed through federal government contracts, including the TIGER Contract.

7.      Eyak Technology, LLC ("EyakTek") was an Alaska Native-owned Small Business and the prime contractor for the TIGER Contract.  EyakTek maintained offices in Dulles, Virginia.

8.      KHAN Family Member B was a close family member of KHAN. KHAN Family Member B controlled a limited liability company, hereinafter referred to as LLC A.  LLC A was in the business of commercial and residential construction.  LLC A maintained offices in Waldorf, Maryland.

**The Bribery Scheme**

9.      In or around late 2005, ROBERT L. MCKINNEY was introduced to KHAN by
KHAN Family Member B.  Prior to that introduction, ROBERT L. MCKINNEY and KHAN Family
Member B had engaged in business transactions, including commercial and residential development
projects using LLC A.  ROBERT L. MCKINNEY learned through the introduction that KHAN was
an employee of the USACE.  KHAN learned through the introduction that ROBERT L.
MCKINNEY was a government contractor.

10.      In or about 2006, with KHAN's assistance, ATG was awarded government contracts
with the USACE.

11.      In or about 2007, after ATG had obtained direct contracts with the USACE with
KHAN's assistance, KHAN explained to ROBERT L. MCKINNEY that there would be "overhead"
costs associated with doing business with the USACE through KHAN.  KHAN explained to
ROBERT L. MCKINNEY that the term "overhead" referred to payments to be made to KHAN to
pay KHAN and other public officials involved in awarding the USACE contracts to ATG.  ROBERT
L. MCKINNEY understood that ATG had to pay the "overhead" to KHAN in order to obtain and
retain government contracting business with the USACE.  ROBERT L. MCKINNEY came to
understand that the "overhead" was derived primarily from materials and services billed to the
USACE by ATG that ATG, at KHAN's direction, did not in fact provide to the USACE.

12.      Rather than pay the "overhead" directly to KHAN, there was an agreement between
KHAN, ROBERT L. MCKINNEY, and KHAN Family Member B to pay KHAN through LLC A.
KHAN, ROBERT L. MCKINNEY, and KHAN Family Member B agreed that LLC A would provide
a plausible justification for the payments and mask the intended beneficiary of the payments, *i.e.*,

KHAN, because ROBERT L. MCKINNEY and KHAN Family Member B had conducted business through LLC A that was unrelated to the USACE and KHAN.  KHAN, ROBERT L. MCKINNEY, and KHAN Family Member B agreed that KHAN Family Member B would distribute to KHAN the amounts paid by ATG to LLC A.  Subsequently, as the payments to LLC A increased in amounts, KHAN, ROBERT L. MCKINNEY, and KHAN Family Member B discussed that LLC A would retain some portion of the overhead to cover the tax liability incurred by LLC A as a result of the payments.

13.     In or about the Summer of 2007, KHAN introduced ROBERT L. MCKINNEY to a different contracting vehicle, the TIGER Contract, which was administered by EyakTek.  KHAN explained to ROBERT L. MCKINNEY that rather than continuing with the direct award of contracts from the USACE to ATG, it would be easier for ATG to obtain additional awards from the USACE through subcontracts with EyakTek under the TIGER Contract.

14.     As directed by KHAN, ROBERT L. MCKINNEY caused ATG to submit fictitious and fraudulently inflated invoices to the USACE and EyakTek.  KHAN used his official position to cause the USACE to approve the invoices and remit payment to EyakTek and ATG.  As directed by KHAN, ROBERT L. MCKINNEY caused ATG to pay a portion of the "overhead" directly and indirectly to KHAN.

15.     From in or about May 2007 through on or about March 2008, as directed by KHAN, ROBERT L. MCKINNEY caused ATG to submit invoices to the USACE and EyakTek for total costs exceeding $1,800,000.  Of that amount, there was approximately $856,395 in "overhead."  That is, as directed by KHAN, ROBERT L. MCKINNEY caused ATG to submit invoices to the USACE and EyakTek for materials and services that ATG ultimately did not provide in the amount of

approximately $856,395.  Between on or about May 30, 2007 through on or about March 3, 2008, as directed by KHAN, ROBERT L. MCKINNEY caused ATG to pay, directly and indirectly, approximately $626,000 of the fraudulent proceeds to KHAN.  At KHAN's direction, ATG retained approximately $245,395 of the fraudulent proceeds.

### The Fictitious and Fraudulently Inflated Invoices

**A.      USACE Contract No. W912HQ-07-P-0057**

16.      In or about May 2007, the USACE issued a Statement of Requirements ("SOR") to provide technical support services to support the USACE's Headquarters.  On or about May 17, 2007, ATG submitted a response to the SOR and proposed to provide the technical services for $90,000.  On or about May 22, 2007, the USACE awarded to ATG the contract, Contract No. W912HQ-07-P-0057, to provide the technical services.  The total contract award was $90,000.

17.      After the award to ATG of Contract No. W912HQ-07-P-0057, KHAN initially informed ROBERT L. MCKINNEY that ATG would not have to provide half of the technical services under the contract, but that ATG should nevertheless invoice the USACE for the entire $90,000.  KHAN requested a portion of the payment that would be paid to ATG by the USACE.

18.      On or about May 23, 2007, ATG submitted an invoice for $60,000 for Contract No. W912HQ-07-P-0057.  ROBERT L. MCKINNEY knew the invoice was fictitious because ATG would not provide all of the services included in the invoice.  Of the amount invoiced, KHAN directed ROBERT L. MCKINNEY to pay $30,000 of the proceeds to KHAN via LLC A.  On or about May 30, 2007, ROBERT L. MCKINNEY caused ATG to issue a check for $30,000 payable to LLC A for KHAN's intended benefit.  ATG retained $30,000 of the proceeds.  On or about May

30, 2007, LLC A issued a check for $30,000 payable to KHAN.  On or about May 30, 2007, KHAN issued a check for $7500 payable to ALEXANDER.

19.     On or about June 8, 2007, ATG submitted an invoice for $30,000 for Contract No. W912HQ-07-P-0057.  ROBERT L. MCKINNEY knew the invoice was fictitious because ATG would not provide all of the services included in the invoice. Of the amount invoiced, KHAN directed ROBERT L. MCKINNEY to pay $15,000 of the proceeds to KHAN via LLC A.  On or about June 8, 2007, ROBERT L. MCKINNEY caused ATG to issue a check for $15,000 payable to LLC A for KHAN's intended benefit.  ATG retained $15,000 of the proceeds.  After paying the $15,000 to LLC A, KHAN informed ROBERT L. MCKINNEY that ATG would not have to provide any services under Contract No. W912HQ-07-P-0057.  On or about June 27, 2007, LLC A issued a check for $15,000 payable to KHAN.  On or about June 28, 2007, LLC A issued a check for $6600 payable to ALEXANDER.

20.     In or about June 2007, KHAN directed ROBERT L. MCKINNEY to pay an additional amount of approximately $10,000-$15,000 in cash to KHAN.  KHAN told ROBERT L. MCKINNEY that the cash was intended to pay "overhead" costs.  At KHAN's direction, ROBERT L. MCKINNEY paid approximately $10,000-$15,000 in cash directly to KHAN.

**B.     EyakTek Purchase Order No. PO002168**

21.     On or about September 12, 2007, EyakTek issued Purchase Order No. PO002168 to ATG for material and equipment to be shipped to KHAN at the USACE's Headquarters.  The amount of the Purchase Order was $407,395.

22.     After the issuance of the Purchase Order to ATG, KHAN informed ROBERT L. MCKINNEY that ATG would not have to provide any materials or equipment under the contract, but that ATG should nevertheless invoice EyakTek for the entire $407,395.

23.     On or about October 5, 2007, KHAN directed ATG to submit an invoice to EyakTek for Purchase Order No. PO002168.  The amount of the invoice was $407,395.  ROBERT L. MCKINNEY knew the invoice was fictitious because ATG had provided no materials or equipment pursuant to the Purchase Order.  Of the amount invoiced, KHAN directed ROBERT L. MCKINNEY to pay $328,000 of the fraudulent proceeds to KHAN via LLC A.  On or about October 26, 2007, ROBERT L. MCKINNEY caused ATG to wire $328,000 to LLC A for KHAN's intended benefit.  ATG retained $79,395 of the fraudulent proceeds.  On or about November 5, 2007, LLC A wired $300,000 to KHAN.  On or about November 6, 2007, KHAN wired $30,000 to ALEXANDER.

**C.     EyakTek Purchase Order No. PO002239**

24.     On or about September 21, 2007, EyakTek issued Purchase Order No. PO002239 to ATG for equipment and materials to be shipped to KHAN at the USACE's facility in Mobile, Alabama.  The amount of the Purchase Order was $591,771.52.

25.     After the issuance of the Purchase Order to ATG, KHAN informed ROBERT L. MCKINNEY that ATG would not have to provide certain of the equipment and materials pursuant to the Purchase Order, but that ATG should nevertheless invoice EyakTek for the entire $591,771.52. KHAN directed ATG not to provide to EyakTek certain of the equipment and materials included on the Purchase Order.

26.     On or about November 2, 2007, ATG submitted an invoice to EyakTek for Purchase Order No. PO002239.  The amount of the invoice was $591,771.52.  ROBERT L. MCKINNEY

knew the invoice was fictitious and fraudulently inflated because ATG had not provided certain of the materials and equipment pursuant to the Purchase Order.

27.     On or about December 6, 2007, EyakTek issued a check to ATG for $591,771.52. Of the amount invoiced, KHAN directed ROBERT L. MCKINNEY to pay $50,000 of the fraudulent proceeds to KHAN via LLC A.  On or about March 3, 2008, ROBERT L. MCKINNEY caused ATG to issue a check for $50,000 to LLC A for KHAN's intended benefit.  ATG retained approximately $103,000 of the fraudulent proceeds.  On or about December 12, 2007, LLC A wired $45,000 to KHAN.  On or about December 13, 2007, KHAN wired $18,000 to ALEXANDER.

**D.     EyakTek Purchase Order No. PO002547**

28.     On or about January 10, 2008, EyakTek issued Purchase Order No. PO002547 to ATG for labor and materials to be shipped to KHAN at the USACE's Headquarters.  The amount of the Purchase Order was $496,468.29.

29.     After the issuance of the Purchase Order to ATG, KHAN informed ROBERT L. MCKINNEY that ATG would not have to provide certain of the labor and materials pursuant to the Purchase Order, but that ATG should nevertheless invoice EyakTek for the entire $496,468.29. KHAN directed ATG not to provide to EyakTek certain of the labor and materials included on the Purchase Order.

30.     On or about February 6, 2008 and February 7, 2008, ATG submitted invoices to EyakTek for Purchase Order No. PO002547.  The total amount of the invoices was $496,468.29. ROBERT L. MCKINNEY knew the total amount invoiced was fictitious and fraudulently inflated because ATG had not provided certain of the materials or equipment pursuant to the Purchase Order.

31.     On or about February 27, 2008, EyakTek issued a check to ATG for $496,498.29. Of the amount invoiced, KHAN directed ROBERT L. MCKINNEY to pay $188,000 of the fraudulent proceeds to KHAN via LLC A. On or about March 3, 2008, ROBERT L. MCKINNEY caused ATG to issue a check for $188,000 payable to LLC A for KHAN's intended benefit. ATG retained approximately $18,000 of the fraudulent proceeds. On or about March 18, 2008, LLC A wired $137,000 to KHAN. On or about March 19, 2008, KHAN wired $17,000 to ALEXANDER.

## COUNT ONE
### (Bribery of a Public Official)

32.     Paragraphs 1 through 31 of this Information are realleged and incorporated by reference as if set out in full.

33.     From in or about May 2007 through in or about March 2008, in a continuing course of conduct, in the District of Columbia and elsewhere, defendant ROBERT L. MCKINNEY did directly and indirectly, corruptly give, offer, and promise things of value to a public official, namely KERRY F. KHAN, and corruptly offered and promised things of value to such public official personally and to other persons and entities as directed by such public official, with the intent to influence official acts, to influence such public official to commit and aid in committing, collude in, and allow fraud, and make opportunity for the commission of fraud on the United States, and to induce such public official to do and omit to do acts in violation of the lawful duty of such public official, to wit, ROBERT L. MCKINNEY gave, offered, and paid approximately $626,000, directly and indirectly, to KERRY F. KHAN in return for KERRY F. KHAN approving contracts and subcontracts awarded through the USACE to ATG.

**(Bribery of a Public Official, in Violation of Title 18, United States Code, Sections 2 and 201(b)(1)(A), (B), and (C))**

## FORFEITURE ALLEGATION

1.      The allegations set forth in Count One of this Information are re-alleged as though set forth fully herein and incorporated by reference for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.      As a result of the offense alleged in Count One of this Information, the defendant shall forfeit to the United States any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of the offense.

3.      The property to be forfeited includes, but is not limited to, the following:

**Money Judgment**

$246,000, which represents a sum of money constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the offense alleged in Count One of the Information;

**Substitute Property**

The real property located at 4658 Leonardtown Road, Waldorf, MD.

4.      By virtue of the commission of the felony offense charged in Count One of this Information, any and all interest that defendant has in property constituting, or derived from, proceeds obtained directly or indirectly, as the result of the offense, is vested in the United States and hereby forfeited to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

5.      If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

a.      cannot be located upon the exercise of due diligence;

-10-

b.      has been transferred or sold to, or deposited with, a third person;

c.      has been placed beyond the jurisdiction of the Court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property that cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of said property listed above as being subject to forfeiture.

**(Criminal Forfeiture, Title 18, United States Code, Section 981(a)(1)(C), and Title 28 United States Code, Section 2461(c))**.

RONALD C. MACHEN JR.
United States Attorney
In and For the District of Columbia


By:  _____/s/_____
MICHAEL K. ATKINSON
D.C. Bar No. 430517
BRYAN SEELEY
D.C. Bar No. 501681
Assistant United States Attorneys
Fraud and Public Corruption Section
555 4th Street, N.W.
Washington, D.C.  20530
202.252.7817 (Atkinson)
202.252.1749 (Seeley)
Michael.Atkinson2@usdoj.gov
DATED: January 23, 2012                          Bryan.Seeley@usdoj.gov